# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| JEFFREY THOMAS LAWSON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:18cv00650 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| MAJOR PARKS, et al., | ) | By: Hon. Pamela Meade Sargent |
| Defendants. | ) | United States Magistrate Judge |

Plaintiff, Jeffrey Thomas Lawson, ("Lawson"), is a Virginia Department of Corrections, ("VDOC"), inmate housed at Pocahontas State Correctional Center, ("Pocahontas"). Lawson has filed this civil rights action pursuant to 42 U.S.C. § 1983, against Southwest Virginia Regional Jail Authority, ("Jail"), employees Major Parks, Captain Hayes, Sgt. Haley, Sgt. Rhymer and Lt. Templeton, alleging that his constitutional rights were violated when he was placed in the Jail's special housing unit for 11 days and by the defendants' failure to protect him from harm. (Docket Item No. 16.) This case is before the court on the defendants' Motion To Dismiss And Memorandum In Support, (Docket Item No. 23) ("Motion").

*I. Facts*

In his second Amended Complaint, (Docket Item No. 16) ("Amended Complaint"), Lawson alleged that the defendants violated his rights by allowing general population inmates to have access to him while he was housed in protective custody. Lawson alleged that the defendants allowed general population inmates who had threatened him to open his cell door when they delivered his meals. He also

-1-

alleged that these general population inmates were allowed out of their cells while he was out of his cell during recreation. He further alleged that Sgt. Rhymer violated his rights by putting him in the special housing unit for 11 days without placing a disciplinary charge against him. He alleged that, while in special housing, he did not receive "hygiene," phone privileges or paper and envelopes. Lawson seeks only monetary damages.

Lawson alleged that he was arrested on September 11, 2018, and held at the Jail's Duffield, Virginia, facility in the 4-B Pod. He alleged that inmate Mike Turner told him that another inmate, Johnny S. Hobbs, had said that, if Turner would "smash" Lawson, he would give Turner a pack of cigarettes. Lawson said he and other inmates were taken to a classroom in the A Pod during a shakedown of the 4-B Pod on September 17, 2018. While there, he said, inmate Matt Howard told Turner that Hobbs had said to "smash" Lawson because Lawson had attempted to rape Hobbs's former girlfriend at knifepoint. Lawson alleged that Turner turned around and began calling him names and saying he was going to "smash" Lawson. Lawson said that he kicked off his shower shoes and had picked up a desk to defend himself when an officer came into the room and charged him with two disciplinary offenses for inciting a fight and having a weapon.

At his September 22, 2018, disciplinary hearing, Lawson said, he told Sgt. Rhymer that he was not trying to fight Turner but, rather, trying to defend himself. Lawson alleged that Sgt. Rhymer dismissed the inciting a fight charge, but found him guilty of the weapons charge. He said that Sgt. Rhymer imposed seven days confinement in special housing. Lawson alleged that he was released from special housing to the 5-B Pod on September 25, 2018. Once in the 5-B Pod, he said, he got into an argument with other inmates over the earlier incident with Turner. He said

he pushed the intercom button and told Officer Light that he could not be housed in the 5-B Pod. Lawson alleged that he was told that the only place they could move him was to the top tier of the 6-B Pod, which was protective custody. He said that he "signed the protective custody paper" and was placed in cell 40 in the 6-B Pod.

Lawson alleged that, on October 3 or 4, 2018, the inmates in cells 40 through 45 of the 6-B Pod were taken to a classroom while their cells were searched. While he was in the classroom, Lawson said, inmate Jimmy Wayne Peters told him that the lieutenant of the AB Building had said for Lawson to go on administrative segregation until he could find out what was going on with Hobbs. Peters told Lawson that Hobbs had told inmate Lewis Wesley Hickman III, who was housed in the 6-B Pod in cell 16, to "smash" Lawson. Lawson said that when he returned to his cell, he told Sgt. Haley that he needed to go on administrative segregation because Hobbs had placed a "smash hit" on him. Lawson alleged that Sgt. Haley told him that no other inmates could get to him in the 6-B Pod. He said that he told Sgt. Haley that the 6-B Pod had general population inmates on the bottom tier. Lawson alleged that Sgt. Haley told him "he would make a call and get back" to him, so he went to his cell and packed up his property and told his cellmate what was happening. He said that Sgt. Haley never followed up with him, so he stayed in his 6-B cell.

Lawson alleged that he was transported to court on October 9, 2018, when inmate Cody Long told him that Hobbs had paid him three "caps" of tobacco to "smash" him. Lawson said that Long gave him a note from Hobbs, which stated: "Thomas bro leave Bree alone we are working things out if I [hear] of you e-mailing her or calling her I'm going to have you touched." He said that Long said, "if I wanted to smash you I can but I'm not." Lawson said that, when he returned to the

Jail, he showed the note from Hobbs to his cellmate, Josh Roberts, and to Peters. Lawson alleged that Peters told him that Hickman wanted Lawson's booking number and pin number to check Lawson's e-mails.

Lawson alleged that, later than same month, Hickman came to him and told him to sign out of protective custody because he believed that Hobbs was just mad and saying things about Lawson that were not true. Lawson said that he signed out of protective custody on October 18, 2018. Lawson said that, on October 19, 2018, Hickman came to him and told him to leave the 6-B Pod or Hickman was going to "pop his door and smash" him. Lawson said he signed back into protective custody that day and was moved to the top tier of the 5-B Pod. Lawson alleged that he told Lt. Templeton that he would not move to the 5-B Pod because general population inmates were housed on its bottom tier. He said he asked to speak with Captain Hayes or Major Parks.

Lawson said that Lt. Templeton came back later that day and told him that he had to move to the top tier of 5-B and that all general population inmates in 5-B would be locked down when protective custody inmates were out of their cells. Lawson said that this was not true because general population inmates from the bottom tier served trays to the top tier protective custody inmates. He said that general population inmates were allowed out of their cells when protective custody inmates were out of their cells for recreation or pill pass. He also said that general population and protective custody inmates were transported together to court.

Lawson alleged that in October 2018 general population inmate Steven Junior Mullins was serving trays to protective custody inmates when he told Joe Harvel, one of Lawson's five cellmates, that Hobbs would pay him "some caps of tobacco"

if he would put Lawson out of the cell. Lawson said that he told Sgt. Rhymer about this threat, but Sgt. Rhymer said he would not move him. When Lawson told him that he could not return to his cell because of this threat, Rhymer said he would put him in "max." Lawson said that, when he told Rhymer that he could not do that, Rhymer told him that he was going to charge him with a disciplinary offense for refusing to lock down. He said that he told Rhymer that he was not refusing to lock down. He said that Rhymer then told him that he was going to move him to special housing until he spoke to Capt. Hayes and Major Parks about the situation. When he arrived in special housing, Lawson said, he wrote two paper request forms, one to Capt. Hayes and one to Major Parks, telling them that he had been moved to special housing because of Hobbs's threats against him. Lawson said that he was moved back to the top tier of 5-B on October 29, 2018, with general population still on the bottom tier.

Lawson's Amended Complaint contains no allegation of any threats toward Lawson by any inmates other than Hobbs and Turner. The Amended Complaint, on its face, states that Hobbs was housed in the 2-A Pod and, therefore, was never housed in the same pod as Lawson. The Amended Complaint contains no allegation that Turner was housed in the same pod as Lawson after September 17, 2018 – the date Lawson said Turner threatened him.

*II. Analysis*

The defendants have moved for dismissal of Lawson's claims against them for failing to state claims upon which relief may be granted. In considering a motion to dismiss, all well-pleaded factual allegations contained in a complaint are to be taken as true and viewed in the light most favorable to the plaintiff. *See Mylan Labs.,*

*Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Furthermore, the allegations in a pro se complaint should be liberally construed. *See Hughes v. Rowe*, 449 U.S. 5, 9-10 (1980). Nevertheless, the complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and it must allege facts specific enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

Lawson's Amended Complaint attempts to allege two claims against the defendants based on violation of his Eighth Amendment right to be free from cruel and unusual punishment:

1. A claim based on failure to protect Lawson; and
2. A claim based on being placed in special housing without facing a disciplinary charge.

Based on the court's review of Lawson's Amended Complaint, the court will grant the defendants' Motion and dismiss Lawson's claims against them.

The Eighth Amendment to the U.S. Constitution protects prison inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994*); Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984). It imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citation omitted). Prison officials violate an inmate's Eighth Amendment right to be free from physical harm inflicted by other inmates when prison officials are deliberately indifferent to

"specific known risks of such harm." *Pressly v. Huto*, 816 F.2d 977, 979 (4th Cir. 1987) (citing *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979)). To establish that prison officials are liable under § 1983 for failure to protect an inmate from violence at the hands of other inmates, a plaintiff must show: (1) "serious or significant physical or emotional injury … or … a substantial risk of such serious harm," *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003), and (2) that the prison officials had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted); *see Odom v. S.C. Dep't of Corrs.*, 349 F.3d 765, 770 (4th Cir. 2003). As to the first prong, "[o]nly extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta*, 330 F.3d at 634. As to the second prong, the requisite state of mind is one of "deliberate indifference" to the inmate's health or safety. *Farmer*, 511 U.S. at 834.

A prison official is deliberately indifferent if he knows of an excessive risk to inmate health or safety and disregards or fails to respond to that risk. *See Farmer*, 511 U.S. at 844-45. Therefore, liability under this standard requires two showings. First, the evidence must show that the prison official subjectively recognized a substantial risk of harm. It is not sufficient that the official should have recognized it; he must actually have perceived that risk. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). Second, the evidence must show that the prison official subjectively recognized that his actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that his actions were inappropriate; the official actually must have recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

To prevail against a defendant on a § 1983 claim, a plaintiff also must show that the defendant acted personally in the deprivation of the plaintiff's rights. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (citing *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). The doctrine of respondeat superior has no application to § 1983 claims. *See Vinnedge*, 550 F.2d at 928.

Taking the facts as alleged in the Amended Complaint as true, and liberally construing them, I find that Lawson has failed to state a claim for failure to protect against any defendant. First, Lawson has not alleged any facts to show that he has suffered any physical or emotional injury. While Lawson alleged that inmate Hobbs had threatened him and attempted to bribe other inmates to harm him, Lawson has not alleged that these threats have caused him any physical or emotional injury. He has not alleged that anyone has physically harmed him, and he has not alleged that he has suffered any emotional harm or mental distress as a result of these threats. Furthermore, Lawson has not alleged sufficient facts to demonstrate a substantial risk of injury. Lawson has not alleged that he had any direct exposure to Hobbs while housed at the Jail. He also has not alleged that any of the inmates who Hobbs attempted to bribe, other than Turner, posed any danger to him on any occasion. To the contrary, the facts alleged by Lawson show that, on several occasions, these inmates actually warned Lawson of Hobbs's threats.

Second, Lawson has not alleged facts showing that any of the defendants were deliberately indifferent to any risk posed to him. To the contrary, the facts alleged by Lawson show that each defendant who he informed of the threats against him took action to protect him. Lawson alleged that, when he informed Sgt. Rhymer at his disciplinary hearing that he was trying to protect himself from Turner by picking up a desk, he was moved from the 4-B Pod to the 5-B Pod. Lawson alleged that,

when he got into an argument with inmates in the 5-B Pod over the prior incident with Turner, he was moved from the 5-B Pod to protective custody in the 6-B Pod. Lawson alleged that, after he signed out of protective custody and received further threats, he was given the option of returning to protective custody in the 5-B Pod. Lawson further alleged that, when he refused to return to protective custody in the 5-B Pod because he feared exposure to general population inmates, he was placed by Sgt. Rhymer in special housing. Lawson alleged that he was released from special housing after 11 days and returned to the top tier of the 5-B Pod with general population inmates on the bottom tier. Nonetheless, Lawson has not alleged that Hobbs, Turner or any of the inmates that Hobbs had attempted to bribe to harm him were housed on the bottom tier of the 5-B Pod after his return to the pod.

I also find that Lawson's Amended Complaint fails to state a claim for violation of his Eighth Amendment rights based on being placed in special housing for 11 days.[1] In particular, the Fourth Circuit has held that confinement in restrictive high-security segregation housing, alone, does not constitute cruel and unusual punishment. *See In re Long Term Admin. Segregation, etc.*, 174 F.3d 464, 471 (4th Cir. 1999).

---

[1] While the defendants have interpreted this claim as an alleged due process violation, Lawson's Amended Complaint does not even contain the words "due process." Lawson did not mention due process until he responded to the defendants' due process argument. Instead, Lawson's Amended Complaint stated that being placed in segregation violated his constitutional right to be free from cruel and unusual punishment. Even if the court were to construe this as a due process claim, it would fail because prison conditions that do not impose atypical and significant hardship on a prisoner in relation to the ordinary incidents of prison life are not constitutionally protected interests under the Due Process Clause. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that disciplinary segregation did not present the type of atypical, significant deprivation in which a state might create a liberty interest).

Based on my finding that no constitutional violation has been alleged in the Amended Complaint against the defendants, I further find that the defendants are protected from liability in this case by the doctrine of qualified immunity. *See Hope v. Pelzer*, 536 U.S. 730, 736 (2002) ("The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation.") Furthermore, "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

An appropriate Order and Judgment will be entered.

**ENTERED:** This 3rd day of February, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE